ESTABROOK v. NEWBURGH LIGHT, HEAT & POWER CO. et al.

(Supreme Court, Appellate Division, Second Department. December 2, 1910.)

1. ELECTRICITY (§ 19*)—INJURIES—PROXIMATE CAUSE—BURDEN OF PROOF.
     To make an electric power company responsible for injuries sustained by a fall from a tree, on the ground that the fall was caused by contact with its electric current, plaintiff must show by a fair preponderance that the immediate cause of his fall was a shock from the company's wires.
     [Ed. Note.—For other cases, see Electricity, Dec. Dig. § 19.*]

2. ELECTRICITY (§ 19*)—INJURIES—BURDEN OF PROOF—NEGLIGENCE.
     To make an electric power company liable for injuries sustained by fall-ing from a tree, claimed to have resulted from contact with a current from the company's wires, plaintiff must show by a fair preponderance that it was negligent in constructing or maintaining its wires.
     [Ed. Note.—For other cases, see Electricity, Dec. Dig. § 19.*]

3. ELECTRICITY (§ 19*)—INJURIES INCIDENT TO PRODUCTION—SUFFICIENCY OF EVIDENCE—CAUSE OF INJURY.
     In an action against an electric lighting company for injuries received by a fall claimed to have been caused by contact with current from de-fendant's wires while trimming trees for a city, evidence held not to sus-tain verdict for plaintiff.
     [Ed. Note.—For other cases, see Electricity, Dec. Dig. § 19.*]

4. ELECTRICITY (§ 19*)—INJURIES INCIDENT TO PRODUCTION—SUFFICIENCY OF EVIDENCE—NEGLIGENCE.
     In an action against an electric lighting company for injuries sustained by a fall claimed to have been caused by contact with currents from de-fendant's wires, evidence held not to show that defendant was negligent in maintaining its wire.
     [Ed. Note.—For other cases, see Electricity, Dec. Dig. § 19.*]
     Hirschberg, P. J., dissenting.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from Orange County Court.

Action by William Estabrook against the Newburgh Light, Heat & Power Company and another. From a judgment for plaintiff and an order denying a motion for a new trial, the defendant named appeals. Reversed, and new trial granted.

Argued before HIRSCHBERG, P. J., and WOODWARD, BURR, RICH, and CARR, JJ.

Arthur F. Gotthold (John L. Wilkie, on the brief), for appellant. R. H. Barnett, for respondent.

BURR, J. Plaintiff, a laborer, was employed by the city of Newburgh. On August 12, 1907, he was sent to cut down an elm tree on North Water street in said city. With the assistance of two others he had removed two of its limbs. While so engaged he stood upon a wooden ladder. In order to reach a third limb, he stepped from the top of the ladder, took hold of the trunk of the tree with his hands, placed his right foot in a crotch of the tree, drove a climbing spur, which was upon his left foot, into the trunk, and almost immediately thereafter fell to the ground, sustaining serious injuries.

In order to hold defendant responsible for his fall and the consequences thereof, he must establish by a fair preponderance of evidence that he sustained an electric shock which was the immediate cause of his fall, that the electricity causing such shock came from defendant's wires, and that defendant was negligent in the construction or maintenance of the same.

Upon each of these basic propositions plaintiff has failed. It is conceded that defendant maintained five wires carrying a heavy current of electricity in close proximity to the tree, and that it had done so for more than a year before the accident. There is no proof that in the original construction defendant failed to exercise reasonable care. The wires were carried upon poles at a height of about 30 feet from the ground. They were of a kind known as No. 4 triple braided weather-proof copper wire. With regard to this the electrical expert called for plaintiff testified:

"I do not think there is anything better known to the art that can be used for overhead transmission commercially than this wire. In other words, this wire which was being used here on this pole line was as good wire as could be used or was used anywhere."

The accident happened within 600 feet of the northerly boundary line of the city, in a suburban neighborhood where there were only two houses on both sides of the block where it occurred. The same expert testified:

"I would not consider it expedient by reason of congested population to put the wires underground at that particular place. So that in constructing a line there I would construct an aërial line properly constructed."

Again, during his cross-examination that was intended to establish that this was the usual, ordinary, and reasonably safe method of construction, the court interrupted defendant's counsel with this statement:

"If you will pardon me, I do not see the materiality of this, as I am not going to charge the jury at all that the mere fact that there were overhead wires there carrying a voltage of 13,000 that negligence can be inferred from that."

To this statement plaintiff's counsel made no objection, and the examination was suspended.

It is not claimed that plaintiff came in actual contact with any of these wires, as a result of which he sustained an electric shock. His contention is that electric current had passed from them into the limbs and trunk of the tree, so that when his body came in contact with the tree he received an electrical shock in consequence thereof. The only criticism upon defendant's conduct is based upon the assumption that defendant was negligent in the maintenance of its wires, because it did not keep the branches of the tree so trimmed away that they could not come in contact with these highly charged wires. No witness was called who claimed that on the day of the accident or immediately preceding that day they saw any actual contact between the tree or any part of it and either of defendant's wires. Thorpe, who was at one time in the employ of the defendant, and who severed his connection with it for reasons which, according to his statement, were satisfactory to him, did testify that:

"At times they (the wires) would not be entirely free from the limbs; at times would come in contact. That is, the branches would reach down on them."

He did not undertake to say when this was, nor the attending circumstances, whether when a high wind prevailed or during a calm, and his testimony as to the location of the wires of the defendant company, the poles supporting the same, the wires of a trolley company, and those of a telephone company, which were also strung in the immediate neighborhood, was so vague and indefinite as to make his testimony as to such contact of little probative value. The evidence is undisputed that the weather was hot and dry on the day of the accident, and that there was only a light breeze blowing, although it is claimed that the leaves of the tree were moist from dew at the time when plaintiff fell.

As against this vague testimony is the direct and positive testimony of Richards, who was manager of the electrical department of defendant from October, 1903, to May 1, 1909, but who was not in its employ at the time of the trial, to the effect that when originally strung the wires were placed so as to be entirely free from the tree. There was no evidence that subsequently to that time the wires had stretched or sagged. The same witness further testified that inspection was had on an average three times a month, and that in July preceding the date of the accident an inspection was made, and that at that time not only was there no limb, but not even a branch or twig, nearer to defendant's wires than a foot or 18 inches, a distance concededly too great for the electric current to pass from the wire into the tree. His testimony is confirmed by that of Hannan, who was superintendent of construction for defendant for a period of 10 or 12 years, and who testified that in the afternoon of the day of the accident he examined the tree and found the same condition to

exist as existed in the July preceding; that the insulation on defendant's wires was not "burned, charred, or frayed," as would be the case "if there is a ground or the passage of current through that insulation"; and that after such examination, and while the current was still on, standing upon the ground, he touched the tree, and "there wasn't any current that escaped from the trunk of that tree into my hand or through my body into the ground." Three men accompanied him on the afternoon of the day of the accident. Two of them, who were no longer in defendant's employ, were called as witnesses and confirmed his testimony. The third man is dead. One of the men who trimmed the tree in July, 1907, and who was in defendant's employ at the time of the trial, was also called, and testified that no branch of the tree came within a foot or 15 inches of defendant's wires.

The only facts from which a jury could be asked to find that plaintiff received an electric shock immediately preceding his fall are that on this trial he testified that, as he drove his spur into the tree he "got a jerk and straightened out," and that afterward he had burns upon his back and his left foot. Neither of the men who were at work with him, who were called as witnesses in his behalf, so far as their testimony indicates, observed any convulsive movement on his part at that time. A former action, brought by plaintiff against the same defendant to recover for injuries resulting from the same accident, was tried before Mr. Justice Keogh and resulted in a nonsuit. It is exceedingly suggestive that the transcript of the stenographer's minutes of that trial shows that plaintiff said nothing on that occasion about feeling any jerk. On this trial he boldly asserted that he did so testify, and that the stenographer's minutes were incorrect. If he had admitted that he did not so testify, either because his attention was not called to it or because he did not realize its importance, it possibly might be accepted as the truth. But the accuracy of the stenographer's minutes is confirmed by the testimony of one of the associate counsel for defendant upon the first trial, who himself took minutes of plaintiff's examination and cross-examination, and asserts that he said nothing of the kind. The two men who were his associates at the time of the accident, and who had previously testified in his behalf, were recalled at the close of defendant's case for examination upon this point. One of them testified that he thought he heard plaintiff say something in his testimony on the first trial about a jerk or stiffening, but that he would not be certain about it, and the other rather guardedly said, "As I recall it, he said he got a jerk"; but on cross-examination he said, "I do not exactly remember, of course I have an idea." In view of the bias of these witnesses toward plaintiff, manifested or admitted, testimony of such character has little probative force, and it is impossible to resist the conclusion that the testimony of plaintiff, given on this trial, that he felt a "jerk," is constrained by the exigencies of the occasion, and should not be accepted as true.

So with regard to the burns upon plaintiff's person. The testimony of the nurse who attended him when he was brought to the hospital, immediately after the accident, is to the effect that when he was brought

in she bathed him and examined his back, that there were small abrasions there, and one upon his foot, which could be accounted for by the fall, but nothing in the nature of a blister. The doctor who attended him at the hospital also testified to the existence of abrasions, but that there were no burns. It is true that upon a former trial of the action the doctor testified as follows:

"Q. Did you examine his body to see if there were any scars on it or burns? A. I examined his body, yes, sir, all over. Q. Were there any burns on his back or scars of fresh burns or any indications of any fresh wounds? A. No, sir. Q. Were there any on his left foot? A. No, sir."

In one sense, a fresh abrasion may be termed a fresh wound, but it may be doubted whether in the connection in which the word was used, namely, in connection with burns or scars of fresh burns, the words "fresh wounds" would suggest an abrasion to the witness' mind. Beyond that, the doctor testified that after the first trial he had refreshed his recollection from the hospital chart and conversation with one of the nurses in charge as to the existence of these abrasions. The only affirmative evidence as to the existence of burns is that of plaintiff's wife and daughter, and one of his companions, to the effect that from three to five days after his fall, and after he had been removed from the hospital to his home, their attention was called to these marks of injury upon his back and foot. It would not be surprising if they were unable to determine from appearance at that time whether these were the result of a burn or an abrasion. One of the medical experts called by plaintiff, who did not see him until nearly nine months after the trial, admitted that in pronouncing the scars to be the result of burns, as he did, he relied entirely on the history of the case, and not on his observation, and that, eliminating such history, he could not tell whether the scar was the result of a burn or flame or a wound. The other medical expert, who did not see plaintiff until May, 1909, admitted that, leaving out the matter of burns, every symptom revealed by plaintiff's condition which he had discovered could have been produced by and attributed to shock resulting from a fall alone. Neither of plaintiff's companions at the time of his fall observed any flash or heard any report, nor observed any burns upon his clothing or shoes, although one of them helped to remove his climbing irons after he had fallen, nor is his clothing produced showing the existence of any burns. Of still greater consequence is the fact that, according to the evidence of plaintiff and both of his companions, no part of his back came in contact with the tree, and the electrical expert called by plaintiff testified as follows:

"Assuming a man's bare hands are in contact with an electrically charged body, his foot is in contact with the electrically charged body, his own person is clothed with ordinary clothing; and assuming that that person finds afterwards that there are blisters on his back, and assuming that his back is not in contact with any electrically charged body, I do not see how he got blisters on his back."

The testimony of plaintiff to the effect that neither nurse nor physician examined him while at the hospital, and during the three days that he was there he received no attention from either, is so inherently improbable that, in view of their positive testimony to the contrary,

it is as incredible as his assertion that he testified as to the "jerk" upon the first trial.

There was some testimony given by two witnesses that at some time prior to the date of the accident they had occasionally observed flashes of light in the tree which they deemed to be of an electrical character. Of itself this evidence is of little value in fixing any responsibility upon the defendant, in view of the uncontradicted testimony that the wires of a telephone company and the guy wire which supports the feed wires of a street surface railroad company passed through the same tree, and that before the accident and in the month of July it was discovered that this guy wire had come in contact with one of the branches of the tree, which was burned and charred in consequence thereof.

When a jury has passed upon conflicting statements, and the justice presiding at the trial has declined to set aside its verdict as against the weight of evidence, an appellate court often hesitates to interfere upon that ground. We are so firmly convinced that plaintiff's case is without merit, and that the verdict was in part influenced by testimony manufactured to meet the apparent necessities thereof, that we should fail in performing our duty if we allowed this judgment to stand.

The judgment and order appealed from should be reversed, and a new trial granted; costs to abide the event.

WOODWARD, RICH, and CARR, JJ., concur. HIRSCHBERG, P. J., dissents.